**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Case No. 2:23CR130 |
| vs. | : | |
| THIERNO SAIDOU BAH, | : | JUDGE MARBLEY |
| Defendant. | : | |

---

**FIRST AMENDED SENTENCING MEMORANDUM OF THIERNO S. BAH**

---

Now comes Defendant Thierno S. Bah, by and through undersigned counsel, and hereby submits his corrected Sentencing Memorandum.

**I.  INTRODUCTION**

Defendant Thierno Saidou Bah is before the Court for sentencing following his guilty plea to counts one through eight of the second superseding indictment, charging him with four counts of use of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §924 (c)(1) (A)(i) and four counts of aggravated robbery of mail in violation of 18 U.S.C. §2114(a). The guilty plea was entered pursuant to a binding plea agreement under Fed.R.Crim.P. 11 (c)(1)(C), calling for a sentencing range of between 20-25 years. For the reasons set forth below, Defendant submits that a sentence at the bottom of the range is appropriate.

As summarized below, Defendant previously had three outstanding objections to the PSR. Defendant withdraws Objection Numbers 2 and 3. Objection Number 1 remains outstanding.

-   Objection Number 1: Enhancement for use of a minor. This objection remains outstanding and is addressed in further detail below.

- Objection Number 2: Enhancement for serious injury. This objection is withdrawn.

- Objection Number 3: It is undersigned counsel's understanding that a revised final PSR will be issued that addresses Defendant's Objection Number 3, relating to his request for a recommended downward departure due to Defendant's upbringing and lack of a parental role. For this reason, and because Defendant will address this mitigating feature herein and at the sentencing hearing, Objection Number 3 is withdrawn.

## II.   SENTENCING FRAMEWORK AND OBJECTION TO THE PSR

The Court is tasked with imposing "a sentence sufficient, but not greater than necessary," to vindicate Congress' sentencing mandate, set forth in 18 U.S.C. § 3553(a)(2). The Court must begin sentencing proceedings by first correctly calculating the applicable guideline range. *Gall v. United States*, 128 S. Ct. 586, 596 (2007). However, this guideline range is only "the starting point and the initial benchmark." The Court "may not presume that the Guideline range is reasonable." *Id.* at 596-97. A sentencing court is "free to make its own reasonable application of the 18 U.S.C. § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 113 (2007) (Scalia, J., concurring). "[E]xtraordinary circumstances [are not required] to justify a sentence outside of the Guidelines range." *Gall* at 595.

### A.  The enhancement for "use of a minor" under §3B1.4 should not be applied.

The PSR assesses an additional two points under §3B1.4, because the "defendant used or attempted to use a person less than 18 years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense." However, even though the enhancement applies to offenders of all ages, regardless of the age differential, it is important to understand that the original version of the enhancement as directed by Congress, instructed that the enhancement should only apply to offenders over the age of 21. This fact in addition to the overwhelming evidence regarding

2

youthful offenders developed over the last two decades, including studies relied on in support of the amended version of §5H1.1, demonstrates that the enhancement should not be applied to offenders younger than 21 years of age. Given all of this (not so very) new information regarding youthful offenders and the origin of the enhancement, it should not be applied herein.  §3B1.4 is woefully outdated.

The Sentencing Commission enacted the enhancement under §3B1.4, in response to a Congressional directive to promulgate guidelines to provide that "a defendant *21 years of age or older* who has been convicted of an offense shall receive an appropriate sentence enhancement if the defendant involved a minor in the commission of the offense." *United States v. Butler,* 207 F.3d 839, 849-852(6th Cir 2000) (quoting the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–22, § 140008, 108 Stat.2033 (1994)). (emphasis added). However, the Sentencing Commission's version of the enhancement under § 3B1.4 was expanded to apply to all defendants, regardless of age. Because Congress never took action to correct the conflict or otherwise object to the expanded enhancement, the Sixth Circuit Court in *Butler* utilized a "Congressional silence theory" to conclude that Congress approved of the expanded amendment and deemed §3B1.4 valid. *Id.* at 846. Defendant submits that the facial conflict arising from the Guideline's direct overruling of an explicit Congressional declaration can no longer be supported under the theory of Congressional silence alone.

The enhancement is also inapplicable because the terms "used" or "attempted to use" in §3B1.4 require a showing that the defendant was responsible for some affirmative use of the juvenile beyond a mere criminal partnership. *Butler,* at 849. While Thierno may have had reason to know that Cameron Newton recruited minors to participate in the robberies, Thierno was merely a peer

to the minors, and not adult figure taking advantage of a minor. Furthermore, as far as Thierno knew, the minors were merely part of the criminal partnership.

## B. Departure under §5H1.1 for Youthful Offenders

The Sentencing Commission's Amendment 829 reflects the overwhelming research compiled over the last several decades regarding at risk youthful offenders and the fact that "certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems." We also know that "youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. **Youthful individuals also are more amendable to rehabilitation.**" (emphasis added). Thierno's age and regrettable upbringing underscores the importance of this amendment and supports a downward departure.

## III.   §3553(a) FACTORS

### A. History and Characteristics

Even though Thierno's parents were married when Thierno was born, his father never lived with the family and he left for Africa when Thierno was still a toddler. Thierno recalls only meeting his father in person twice, when he was between 7 and 8 years of age. Any contact after the two meetings was virtually nonexistent. The last contact Thierno had with his father was shortly after he signed a plea agreement relating to the instant offense. Thierno's father berated him for signing the plea agreement and called him "stupid." Unfortunately for Thierno, and perhaps because of their own overwhelming personal issues, Thierno's other family members were never able to provide any long-term stability or guidance to Thierno during his formative years. As a result, Thierno spent his entire childhood and up to the date of his arrest, in constant survival mode. He

4

lived day to day, never knowing when he would have to pick up and move. His stay at Butler County Jail is the longest period of time he has lived at the same place since he was a toddler.

Following his parents' divorce, Thierno's mother was unable to provide stable housing for him and his two older siblings, and frequently relied on Thierno's grandmother and other family members for a place to stay. When he was nearly 5 years of age, his mother remarried briefly, but nothing changed and the marriage was short-lived. When Thierno was 11 years of age, his mother remarried for the third time, to Amadou Ndiaye. Unfortunately for Thierno and his family, the marriage to Ndiaye only seemed to make things worse.

Mr. Ndiaye was a heavy marijuana smoker and drinker, did not work and moved in with Thierno's family at his mother's house. Ndiaye was verbally and physically abusive to Thierno and his mother, frequently threatening to kill Thierno and his mother. Thierno recalls that his mother and Ndiaye often argued about money because Ndiaye did not work. Thierno believed that most of his arguments with Ndiaye were about Ndiaye's violent beatings and name calling of his mother. Thierno also believed that, even though Ndiaye called his mother a "bitch, dumbass and whore," his mother would still always take Ndiaye's side.

When Thierno was approximately 11 years of age, Ndiaye planned to open a restaurant and recruited Thierno's family to contribute everything they had towards the business. In doing so, the family lost their home and lived in a car for several months with his siblings. Shortly thereafter, the family moved into Ndiaye's new restaurant. Thierno and his siblings lived in the back of the restaurant in a storage closet. Thierno's school was located across the street. Thierno recalls

dreading when the school day was over because he would have to return to the storage closet at the restaurant. The restaurant went under in approximately one year.

Following the close of the restaurant, Thierno and his family moved to Atlanta to live with Ndiaye's other children. For approximately 8 months, the family relied on Airbnbs to rent rooms from strangers for short periods of time. During these 8 months, because they had no residence and his family did not see school as a priority, Thierno did not attend school at all. While still in Atlanta, Ndiaye found a sponsor to open another restaurant, but that one failed as well.

While still in Atlanta and desperate to change his unstable living situation and return to school, Thierno contacted an aunt in California and asked for help. Thierno's mother did not approve of the move, particularly since Thierno did not know this relative. However, Thierno was willing to take the risk and his mother agreed. Shortly after Thierno moved to California, his mother moved to Africa without telling him.

When Thierno arrived in California, he enrolled in school and joined the football team. Because he had no school records, Thierno had to enroll as a high school freshman at the age of 16. Thanks to his football coach at Diablo High School, "Coach DJ" drove Thierno to school every morning and bought him meals and football gear. Thierno loved school and was there long enough to see a future by way of a football scholarship. Unfortunately, his dream to stay in California ended when his aunt decided to move to Paris, France. Thierno wanted to go to Paris with his aunt, or at least stay in California with his coach, but his mother would not allow either scenario.

When Thierno's aunt decided to move to Paris, Thierno and Coach DJ begged his mother to allow him to stay in California and live with Coach DJ. Unfortunately, Thierno's mother refused

6

and would not complete the necessary paperwork. Coach DJ then generously paid for Thierno's plane ticket back to Columbus. Upon his return, Thierno moved in with his paternal uncle and his six children. Due to the missing paperwork, Thierno had no guardian and lost another 4 months of school. In addition, his uncle's home was filthy, had rodents and roaches, no hot water, and the electricity was frequently turned off.

Eventually, Thierno enrolled at Briggs High School on the west side of Columbus, but lived with his older sister and her children on the other end of town. Later, when Thierno's mother returned from Africa with Ndiaye, Thierno moved in with his mother and Ndiaye, who was diagnosed with terminal cancer. Due to his illness, a charitable program donated a home to Ndiaye.

Unfortunately, when Thierno reunited with his mother and Ndiaye, the fighting resumed and the living situation was untenable. There would be physical fights before and after school and Thierno had to rely on his coach or the COTA bus for transportation to get to school on the other side of town and football practice. Making things worse, Thierno's mother was rude and distrustful of his football coach.

When Ndiaye died, Thierno's mother returned to Africa, leaving the house to Thierno's uncle and his children. Thierno stayed at the home until everyone was evicted due to failure to pay the rent. After the eviction, Thierno stayed at the house by breaking in and living there without water or electricity. After he was ordered to leave, Thierno broke into cars for a place to sleep.

During his high school senior year, Thierno got a job at Lowe's and lived with his sister and her children. Because he had no transportation and could not enroll in a closer school without a parent signing off, he quit football and stopped going to school. Later, he would move back and

7

forth between his sister's home and the home of his longtime friend and former teammate Kenan "Kenny" Lay. Eventually, his sister's home was no longer an option because she was evicted and moved to Florida with a new boyfriend.

When Thierno stayed with Kenny, he and Kenny were permitted to drink, smoke and play video games in front of Kenny's father. Kenny's house was always crowded with older people who would party all day. At this point, the hope of any future with football or returning to school was long gone and Thierno's only focus was living day to day.

Throughout Thierno's teenage years, football and his connection to his teammates and football friends was his only refuge. Being part of a team was likely the only structure or routine Thierno ever experienced. Football was also the one thing that Thierno felt he was good at. It became much of his identity. When COVID hit and the football season was shortened, Thierno held onto hope for the next school year and enrolled in summer training at a local football training facility.

While at the football training program, he met Cameron "Cam" Newton. Cam, in turn introduced Thierno to several athletes, including some of the codefendants involved in the instant offense. These young men became Thierno's closest friends and most reliable resource for support. When Thierno gave up on football, he was grateful to still have his friends.

After moving in with Kenny, Thierno met Kenajanae Freeman and engaged in a long-term relationship. Shortly into the relationship, Thierno learned that Kenajanae was pregnant and began feeling the pressure to make money to find a place for all of them to stay together. It was during this time period that Thierno involved himself in the instant offense.

8

Shortly after Thierno's son was born, he was arrested for the instant offense. Kenajanae remained supportive for several months during Thierno's pretrial detention and was interviewed by the Probation Officer for the PSR. However, Kenajanae has since ended her relationship with Thierno and is expecting a child with her new boyfriend.

### B. Circumstances of the Offense

As explained in the PSR, Thierno was not the planner or recruiter in the string of violent robberies. However, Bah was given the role of "jump out guy" and tasked with robbing the postal workers at gunpoint. He was not involved any of the planning and did not even have his own transportation or gun. All of this was arranged for him. Thierno recruited no one. And even though Thierno clearly had the messiest and most dangerous role, he made a nominal amount of money and had little to no say in the amount he received. The money he did receive went to help pay his girlfriend's rent and other basic living expenses.

At the sentencing hearing, Thierno is prepared to accept full responsibility for his conduct, and apologize to the Court and the victims. He understands and appreciates that he hurt innocent people, and their lives were forever changed by his violent conduct.

### C. Just Punishment, Adequate Deterrence, Protection of the Public, and Needed Treatment

Thierno is only 20 years of age and has never been to prison. The stipulated sentencing range is 20-25 years, more than enough time to adequately address the statutory sentencing goals. Even though Thierno has been in federal custody since August 2023, he still has many, many years – possibly two more decades, to serve before he is released. For a young man who committed the instant offense at age 19 and has never been to prison, it is difficult to plan for, much less even

fathom such a lengthy a term of imprisonment. In addition, Thierno's conviction for instant offense automatically disqualifies him from receiving the benefit of recidivism reduction programs and other productive activities that normally allow inmates to earn credits towards prelease, supervised release, or from receiving federal time credits under the First Step Act, or even the RDAP Program.

Because of the seriousness of the offense of conviction, Thierno will also likely receive an overstated security designation. Unlike most offenders sentenced for multiple 924(c) convictions, Thierno has no idea what to expect. He is understandably frightened about what is to come and even though he is eager to move on from the Butler County Jail, he is worried about his safety. For this reason, Theirno asks this Court to consider requesting an order for a management variable that allows for a recommendation for a lower-level security facility. To ensure that the Bureau of Prisons recognizes the importance of this request, undersigned counsel respectfully requests that this recommendation is documented in the Statement of Reasons.

IV.     **CONCLUSION**

In light of all of the aforementioned factors, Defendant Thierno Saido Bah respectfully requests that this Court accept the binding plea agreement and sentence Defendant at the bottom of the stipulated range, followed by a term of supervised release.

Respectfully submitted,

  /s/  Rasheeda Z. Khan
Rasheeda Z. Khan (0075054)
545 Metro Place South, Suite 435
Dublin, Ohio  43017
(614) 745-8849 Phone
rkhan@petersonconners.com
*Attorney for Defendant*
*Thierno S. Bah*

10

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing was electronically served upon Noah Litton, Assistant United States Attorney, Office of the United States Attorney, via the Court's electronic filing system on this 22nd day of January, 2025.


    /s/   Rasheeda Z. Khan